**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**DONNA KOVALESKI,**            :

       **Plaintiff**          :     **CIVIL ACTION NO. 3:08-2205**

       **v.**                :        **(MANNION, M.J.)**

**COUNTY OF LACKAWANNA and**    :
**COUNTY OF LACKAWANNA**
**TRANSPORTATION SYSTEM**      :
**(COLTS),**

                          :

       **Defendants**

                          :

## <u>MEMORANDUM AND ORDER</u>[1]

Pending before the court are (1) a motion for summary judgment filed

on behalf of the County of Lackawanna, (hereinafter "the County"), (Doc. No.

41), and (2) a motion for summary judgment filed on behalf of the defendant

County of Lackawanna Transportation System, (hereinafter "COLTS"), (Doc.

No. 48).


**I.**     **PROCEDURAL HISTORY**

By way of relevant background, the plaintiff filed the instant action on

---

[1]For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

December 8, 2008, in which she alleges employment discrimination and retaliation due to gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§2000e, et seq., as well as the Pennsylvania Human Relations Act, (hereinafter "PHRA"), 43 P.S. §§951-963. (Doc. No. 1). On March 16, 2009, the County filed an answer with affirmative defenses. (Doc. No. 10). COLTS filed an answer with affirmative defenses on March 25, 2009. (Doc. No. 11).

On May 21, 2009, the parties consented to proceed with the instant action before the undersigned pursuant to 28 U.S.C. §636(c). (Doc. No. 19).

After several extensions of time, final dispositive motions were set to be filed on or before August 15, 2011. (Doc. No. 40). On June 29, 2011, the County filed its motion for summary judgment, (Doc. No. 41), along with a statement of facts, (Doc. No. 42), and supporting exhibits, (Doc. No. 43). A brief in support of the County's motion was filed on July 13, 2011. (Doc. No. 44).

On August 15, 2011, COLTS filed its motion for summary judgment, (Doc. No. 48), along with a supporting brief, (Doc. No. 49), and statement of material facts with exhibits, (Doc. No. 50).

After having been granted extensions of time to do so, (Doc. No. 46, Doc. No. 51), on October 17, 2011, the plaintiff filed an answer to the statement of facts filed by the County, (Doc. No. 56), a brief in opposition to

the County's motion for summary judgment, (Doc. No. 57), an answer to the

statement of material facts filed by COLTS, (Doc. No. 58), a brief in opposition

to the motion for summary judgment filed on behalf of COLTS, (Doc. No. 59),

and supporting exhibits, (Doc. No. 60, Doc. No. 61, Doc. No. 62). On October

31, 2011, COLTS filed a reply brief in support of its motion for summary

judgment. (Doc. No. 64). On November 2, 2011, the County filed a reply brief

in support of its motion for summary judgment. (Doc. No. 65).


## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the
> existence of an element essential to that party's case,
> and on which that party will bear the burden of proof
> at trial.  In such a situation, there can be 'no genuine
> issue as to any material fact,' since a complete failure
> of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other
> facts immaterial. The moving party is 'entitled to
> judgment as a matter of law' because the nonmoving

> party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted). Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the evidence nor make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

4

## III.    DISCUSSION

In her complaint, the plaintiff alleges that the County, at all relevant times, placed its Director of Transportation, Jim Finan, upon the Board of Directors of COLTS with the power and authority to oversee all matters including Title VII complaints of employment discrimination, investigations into internal charges of employment discrimination, and management of hiring and termination of employees. According to the plaintiff, the County appointed Paul Tolerico as General Manager of COLTS at all times relevant to this matter. The plaintiff alleges that the County and COLTS are each an employer covered by the anti-discrimination and anti-retaliation mandates of Title VII and/or the PHRA.

According to the plaintiff's complaint, she was employed by COLTS as a bus driver on July 3, 2006, until March 2, 2007. During her first week of employment, the plaintiff alleges that she was subjected to different terms and standards of employment, due to her gender, in that she was initially denied pay for what was designated as a paid holiday by the union contract, (i.e., July 4, 2006). Further, during her first month of employment, the plaintiff alleges that she was asked what sexual favors she performed in order to receive her job.

Within ninety (90) days of employment, the plaintiff alleges that she was

5

"summoned to the office of her direct Supervisor, told by him that she did not need union representation present, and he very clearly in vivid language expressed interest in her and directed unwelcomed sexual attention, unwelcomed sexual conduct, unlawfully and without her consent touched her breasts, he invited her to his home, he told her he wanted a mature woman just like her, he told her he wanted Plaintiff to cook for him and sunbathe at his home while he watched from his house window, and inquired whether Plaintiff had 'stretch marks' after learning that she had three (3) children." After this incident, the plaintiff alleges that she initiated compliance with internal reporting procedures and went to human resources to complain about the incident, but was only directed to speak with COLTS' General Manager. The plaintiff alleges that she, in fact, contacted the General Manager and was told to solve her own problems. The plaintiff alleges that she ultimately returned to human resources and notified the Human Resources Manager that she would have to resign because it was apparent that, as of February 2007, neither human resources nor the General Manager had taken any steps toward preventive or corrective opportunities to resolve the plaintiff's situation.

The plaintiff alleges that her complaints to human resources went uninvestigated "because the Plaintiff was told by the Human Resources Manager that hopefully with the election we won't have to put up with this sort

of problem any longer."

After the plaintiff rejected unwelcomed sexual attention from her direct supervisor, she alleges that the same supervisor imposed adverse and tangible employment action, including extending the plaintiff's probationary period numerous times, issuing a written warning for oil leaking from her bus and another for unreported damage to her bus, was told by another female driver that this male supervisor was going to get her for making the complaints, and encountered a time when the male supervisor refused to assist the plaintiff despite receiving a complaint that a passenger was threatening her and, instead, replied that the plaintiff was "too thin-skinned and needed to toughen up." The plaintiff alleges that this same male supervisor instituted charges and accusations against her which were not instituted against male bus drivers.

In February 2007, during a snow storm and blizzard, the plaintiff alleges that she was told to sleep in the garage with the men and that she would be the "entertainment for the (male) drivers." That same month, the plaintiff alleges that she was denied bereavement leave to take time off to attend the funeral of a family member. Again, in February 2007, the plaintiff alleges that she became sick at work, including vomiting and severe distress. On this occasion, the plaintiff alleges that she was told to sit in the cold garage where

7

there was no heat and was refused the opportunity to leave work for four (4) hours.

The plaintiff alleges that the reprimands imposed upon her by her male supervisor were in retaliation for her opposition to unlawful employment practices and permanently remain within her employment file.

After the plaintiff complained to the COLTS Human Resource Manager and General Manager, she alleges that she became the subject of unwelcomed and unwanted comments of a sexual nature about her body and, despite her complaints, was told by male co-workers that she should be grateful that those co-workers would not talk about other female's bodies.

The plaintiff alleges that her male supervisor set her up to fail and for the purpose of continuing her on probation brought petty accusations against her which, except for her gender and prior opposition to unlawful employment practices, would not have been brought against a male or her. In this regard, the plaintiff alleges that her gender was a substantial factor leading to the discrimination and her treatment would have been different if she was a male.

According to the plaintiff, she involuntarily terminated her employment and provided two (2) days prior notice and a last opportunity to resolve the complaints of sexual harassment and retaliation. She alleges that she told the COLTS Human Resources Manager the reasons why she was leaving

8

employment was related to sexual harassment and unfair treatment, and asked the Human Resources Manager not to tell her male supervisor that she was leaving or the reason why.

Based upon the above allegations, the plaintiff alleges that the defendants violated her rights under Title VII, as well as the PHRA. The plaintiff is seeking an injunction prohibiting the defendants from engaging in future violations of Title VII or the PHRA; compensatory and back pay damages (items of lost compensation such as, but not limited to overtime and shift differential), fringe benefits and pre-judgment and post-judgment interest; front pay damages for a reasonable time beyond judgment; an award of prevailing party attorneys' fees and costs associated with the suit; and such other relief as the court deems just and proper.

## A.   Motion for Summary Judgment by the County

The County has submitted a statement of material facts in support of its motion for summary judgment, the following of which the court finds are supported by the record and are not in material dispute.

COLTS was created in 1972 pursuant to the Municipal Authorities Act of 1945. COLTS is operated by a Board of Directors[2]. COLTS has the

---

[2]The plaintiff denies this fact citing to testimony by County Commissioner Robert Cordaro with regard to steps taken by the County

9

exclusive authority to hire and fire the employees of COLTS upon or subject to recommendations made by the County[3]. COLTS has the exclusive authority to promulgate work rules and assignments for COLTS' employees. COLTS' 2006-2007 employee handbook sets forth the standards, policies and procedures which governed the plaintiff's employment at COLTS. COLTS has the exclusive authority to set and/or negotiate with the applicable union, conditions of employment, including compensation, benefits and hours for COLTS' employees.

The plaintiff was employed by COLTS as a bus driver from July 3, 2006,

---

Commissioners to dissolve the COLTS Authority and the plan to consolidate COLTS' operations with the County. In this regard, Mr. Cordaro testified that a transportation council was created which co-existed with COLTS' Board of Directors and, ultimately, it was the long term plan to have the transportation council take over the power of the Authority. Mr. Cordaro's testimony, however, indicates that, ultimately, the Authority was never dissolved and that the transportation council had no official authority over COLTS' Board of Directors, but was advisory in nature only. In addition, for her part, the plaintiff acknowledged that she was aware that COLTS was operated by a board of directors, but denied knowing the responsibilities of the board. (Doc. No. 43, Ex. 2, p. 209).

[3]Again, the plaintiff denies this statement citing to testimony from Mr. Cordaro, in which Mr. Cordaro stated that he "felt" that the County could hire and fire employees of COLTS. Mr. Cordaro went on to testify, however, that the transportation council had no such authority to hire and fire, and that the County could ultimately only recommend that an individual be hired or fired and that COLTS' board of directors would ultimately make the decision.

through March 2, 2007[4]. During her employment with COLTS in 2006-2007, the plaintiff did not receive any W-2 from Lackawanna County[5].

The terms and conditions of the plaintiff's employment at COLTS were governed by the terms of the July 1, 2005, through June 30, 2009, collective bargaining agreement between COLTS and the Amalgamated Transit Union, Division #168.

While employed at COLTS, the plaintiff was enrolled in COLTS' group health benefits plan. In addition, the plaintiff participated in the County of Lackawanna Transit Authority Retirement Plan. COLTS handles exclusively the day-to-day supervision of employees of COLTS, including employee discipline[6]. COLTS' dispatchers managed the day-to-day activities of COLTS'

---

[4]In her response, the plaintiff denies this statement of fact claiming that she was both an employee of COLTS and Lackawanna County. In her complaint, the plaintiff specifically alleges "[p]laintiff was employed beginning July 3, 2006 by Defendant COLTS as a bus driver until forced into constructive discharge on 3/2/07." (Doc. No. 1, ¶15). Therefore, the court finds the fact, as stated, undisputed. The issue of whether the County was a co-employer will be discussed in relation to the legal arguments raised by the County in its motion for summary judgment.

[5]The plaintiff denies this statement indicating that, at one point, the County made a decision to withhold a subsidized payment to COLTS in the amount of a half million dollars. This does not, however, go to the fact of whether the plaintiff received a W-2 from the County in 2006 or 2007.

[6]The plaintiff denies this statement citing to unrelated testimony relating to the hiring and/or firing of COLTS employees, not day-to-day supervision. Moreover, COLTS in response to a request for admissions has admitted to its

bus drivers. COLTS is in exclusive control of all of COLTS' employee records,

including payroll, insurance, taxes and the like.

The County is a separate corporate entity than COLTS[7]. Moreover,

COLTS' employees are not considered to be employees of the County[8].

The plaintiff did not report the alleged misconduct of COLTS' supervisor,

Anthony Koloras, or to anyone at the County[9]. At all relevant times, Anthony

Koloras was an employee of COLTS[10].

---

exclusive authority in this capacity.

[7]Although the plaintiff's counsel denies this statement in one breath, in the very next, he argues that COLTS was left as a separate entity for "legal protections." Regardless of the reasons why it was such, the fact that COLTS was a separate corporate entity is supported by the County of Lackawanna Transit System Authority's articles of incorporation and certificate of incorporation, (Doc. No. 43, Ex. 1), as well as the testimony of former County Commissioner Robert Cordaro, who directly testified that the County was "obviously" a separate corporate entity than COLTS, (Doc. No. 43, Ex. 3, pp. 53-54).

[8]The plaintiff denies this statement; however, Mr. Cordaro directly testified in response to questioning that employees of COLTS would not be considered employees of the County. (Doc. No. 43, Ex. 3, p. 51).

[9]Plaintiff's counsel denies this statement indicating that he reported the filing of the plaintiff's charge of employment discrimination with the EEOC to the County Commissioners; however, the plaintiff's direct testimony was that she never reported Mr. Koloras' misconduct to anyone at Lackawanna County. (Doc. No. 43, Ex. 2, p. 221).

[10]Plaintiff admits that Mr. Koloras was an employee of COLTS, but argues that he was also an employee of the County.

In its motion for summary judgment, the County argues that COLTS is an autonomous authority independent of the County. (Doc. No. 44, pp. 4-5). To this extent, the County argues that, on or about November 1, 1972, the County Board of Commissioners organized COLTS pursuant to the Municipal Authorities Act of 1945 for the purposes of operating a mass transportation system. In accordance with the Municipal Authorities Act and similar enabling legislation, the County argues that the Pennsylvania Supreme Court has consistently held that such authorities are "not the creature, agent, or representative of the municipality organizing it.[11]" Rather, the County argues that, pursuant to the Municipal Authorities Act, the powers of the Authority are vested in its own board of directors, which has "full authority to manage the . . . business of the Authority and to prescribe, amend and repeal by-laws, rules and regulations governing the manner in which the business of the Authority may be conducted.[12]" The County argues that, according to statute, each authority is granted and may exercise all powers necessary or convenient for the carrying out of its intended purpose, including in pertinent part, the power "[t]o appoint officers, agents, employees and servants, to

---

[11]See Appeal of Simon, 184 A.2d 695, 697 (Pa. 1962); see also Commonwealth v. Erie Metro. Transit Auth., 281 A.2d 882, 884 (Pa. 1971).

[12]See 53 P.S. §309.

prescribe their duties and to fix their compensation.[13]"

In response, the plaintiff acknowledges the County's argument that Pennsylvania case law stresses that authorities are independent bodies, not agents or alter egos of the municipalities that created them, but argues, without more, that during the plaintiff's employment "this design of authorities being a 'independent body' from the County was <u>not</u> followed by majority Commissioner, Robert C. Cordaro." (Emphasis in plaintiff's brief).

Initially, the plaintiff's bald assertion that COLTS was not an autonomous authority, without more, is insufficient to counter the County's motion for summary judgment[14]. Moreover, despite the plaintiff's claim, the County's materials, including the County of Lackawanna Transit System Authority's articles of incorporation and certificate of incorporation, as well as the testimony of Mr. Cordaro, who directly testified that the County and COLTS were separate corporate entities, that the Authority was never dissolved under his consolidation plan as intended, and that the transportation council was only advisory to the board, support the County's position that COLTS was an autonomous authority independent of the County, despite Mr.

---

[13]See 53 P.S. §306(B)(g).

[14]Whether or not the plaintiff set forth facts in her responsive statement of facts regarding her position that COLTS was not an autonomous entity, counsel has not briefed the issue. It is not for the court to search the record to find support for the plaintiff's position.

Cordaro's intentions and plans to the contrary.

In any event, the County argues that no record evidence exists to demonstrate that the County exercised such control over the daily employment activities of the plaintiff which would warrant the imposition of "joint employer" liability against the County. (Doc. No. 44, pp. 5-9).

The parties agree that the Third Circuit has extended the "joint employer" theory of liability to the Title VII context. Moreover, they agree that the factors set forth in Myers v. Garfield & Johnson Enters., Inc., 679 F.Supp.2d 598 (E.D.Pa. 2010) are to be considered in determining whether an entity is a "joint employer." These factors include: (1) [a]uthority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like." Id. at 607. No single one of these factors is dispositive and a weak showing on one factor may be offset by a strong showing on the other two. See Butterbaugh v. Chertoff, 479 F.Supp.2d 485, 496-97 (W.D.Pa. 2007).

Here, the County argues that it had no authority to hire and fire COLTS' employees, promulgate work rules and assignments, or to set conditions of employment, including compensation, benefits and hours. The plaintiff, in fact,

15

admits that COLTS has the exclusive authority to promulgate work rules and assignments for COLTS' employees; that COLTS' 2006-2007 employee handbook sets forth the standards, policies and procedures which governed the plaintiff's employment at COLTS; that COLTS has the exclusive authority to set and/or negotiate with the applicable union, conditions of employment, including compensation, benefits and hours for COLTS' employees; and that the terms and conditions of the plaintiff's employment at COLTS were governed by the terms of the July 1, 2005, through June 20, 2009, collective bargaining agreement between COLTS and the Amalgamated Transit Union, Division #168. (Doc. No. 56, ¶¶ 5-8).

The only issue with respect to this factor then is whether the County had authority to hire and fire employees. To this extent, COLTS has admitted in response to the County's request for admissions that it had the exclusive authority to hire and fire the employees of COLTS "upon or subject to recommendations made by [the County]." (Doc. No. 43, Ex. 6). Mr. Cordaro himself testified that employees of COLTS were not considered employees of the County, and that the transportation council did not have the authority to hire or fire COLTS employees. Mr. Cordaro testified that the transportation council was advisory in nature only and did not have any official authority. Although he testified that he "felt" that the County could hire and fire COLTS

employees, he also testified that the County could only make a recommendation regarding hiring or firing to COLTS' Board, but the board of directors for COLTS would ultimately make the decision.

In addition, despite the plaintiff's heavy reliance upon the testimony of Mr. Cordaro regarding his "long term plans" and "intentions" with respect to the Authority, there is no evidence in the record that the Authority was dissolved or that it failed to maintain its statutory powers imposed by the Municipal Authorities Act to appoint employees, proscribe their duties, fix their compensation and regulate the manner in which the business of the Authority was conducted. Thus, the record does not support that the County had any real or direct authority to hire or fire employees of COLTS. Based upon the plaintiff's admissions and the record, this initial factor weighs in favor of the County.

The next factor is whether the County had any control over the day-to-day supervision of employees, including employee discipline. Here, the County argues that the plaintiff has acknowledged that her day-to-day activities were managed by the COLTS' dispatcher, (Doc. No. 56, ¶12), and that COLTS' bus drivers, including the plaintiff, were supervised by COLTS' superintendent of transportation, who had the authority to impose disciplinary action against the drivers. (Doc. No. 43, Ex. 2, pp. 140-41). The defendant

argues that there exists no evidence in the record which demonstrates any instance in which the County or the transportation council disciplined the plaintiff or any other employee of COLTS.

Plaintiff's counsel does not directly address this factor in his opposing brief, but only generally argues that Mr. Cordaro's testimony "raise[s] questions of actual operational control or entanglement between [the County and COLTS]." Since the plaintiff has failed to point to any direct evidence in the record which indicates that the County actually managed the day-to-day supervision of COLTS' employees, including the imposition of employee discipline, this factor also weighs in favor of the County.

Finally, the court must consider whether the County had control of COLTS' employee records, including payroll, insurance, taxes and the like. Here, COLTS has admitted that it is in exclusive control of all of these records. (Doc. No. 43, Ex. 6). However, the plaintiff argues that the County maintained control over COLTS' computer system and further maintained control over COLTS' insurance and vendors. In so arguing, the plaintiff relies, in part, on the testimony of Paul M. Talerico, General Manager at COLTS at the relevant time, who responded in the affirmative to an inquiry by plaintiff's counsel that "[a]t the time in August '07, in fact, he[15] was involved with the

---

[15]There is no contextual testimony in order to allow the court to determine who the "he" is to whom the plaintiff's counsel is referencing.

computer changeover to the county if you remember, right?" Plaintiff's counsel then references Mr. Talerico's testimony in which he indicates that "[he] recall[ed] something to do with the computer system[,]" but "[did not] know the specifics of it." Mr. Talerico also testified that, during his employment, he recalls that the insurance vendor changed. In this regard, Mr. Cordaro testified that there was some involvement with the County as to a change in the Workers' Compensation carrier at COLTS as part of his integration plan so that all insurance would be the same across the board without multiple overlap.

Even to the extent that there is a factual dispute with respect to whether or not the County exercised authority over the Workers' Compensation carrier utilized by COLTS, and even weighing the dispute in the plaintiff's favor, in light of COLTS' admission and the scant testimony provided by Mr. Tolerico, the record simply does not provide support that the County had exclusive control over the necessary records in order that this factor would weigh against the County.

Because the record demonstrates that the County and COLTS were separate corporate entities and that the County of Lackawanna was not a joint employer of the plaintiff, the motion for summary judgment filed on behalf of

the County of Lackawanna will be granted[16].

### B.    Motion for Summary Judgment by COLTS

In support of its motion for summary judgment, COLTS has provided a statement of material facts, the following of which the court finds supported by the record and not in material dispute.

The plaintiff began her employment with COLTS on July 3, 2006, as a bus driver. As a driver, her responsibilities included those identified in the job description, Employee's Handbook, and Collective Bargaining Agreement.

During the plaintiff's tenure with COLTS, Paul Talerico was the General Manager; however, he is no longer employed with COLTS. Also during this time, Anthony Koloras was the Superintendent of Transportation and the plaintiff's immediate supervisor.

On or around July 4, 2006, the plaintiff was informed that she would not be compensated for the July 4th holiday. The plaintiff claims that the denial of pay was based upon her gender. The Collective Bargaining Agreement,

---

[16]In its motion for summary judgment, the County argues the substance of the plaintiff's claims in the alternative. Because the court finds that the County is entitled to summary judgment on the basis that it was a separate entity and not a joint employer of the plaintiff, the substance of the plaintiff's Title VII claims need not be addressed with respect to the County, but will be decided on the basis of the arguments presented by COLTS in its motion for summary judgment.

Section 16, titled "Holidays" provides, "If an employee works four (4) days in a holiday week, but does not work the holiday, he will be paid for the holiday at straight time." This was ultimately resolved and the plaintiff was paid for the holiday as provided within the Collective Bargaining Agreement.

The plaintiff alleges that she was subject to a number of reprimands from her supervisor, Anthony Koloras, as a result of her gender. She further alleges that Mr. Koloras was obsessed with her breasts and that he constantly stared at her. Included among the claims against Mr. Koloras is that he abused his authority and responsibility by calling the plaintiff into his office, closing the door and immediately telling her that she did not need union representation, and then provided details of his interest in her, including that he wanted her to visit his home, sunbathe at his pool and cook for him. The plaintiff expands on these claims by stating:

> ". . . Mr. Koloras began the meeting by calling plaintiff into his office under the false pretense of telling her that she needed to conduct a "meeting" with him. At that time, plaintiff was standing outside of the doorway of Mr. Kolorus's office. Immediately after asking plaintiff how her job was and if she liked her job he then informed her, in reply to her question of 'what is this meeting in reference to?' "I need to get to know you better. You are one of my employees and I need to get to know you better, and I haven't had a chance to speak with you personally behind closed doors." (Exhibit A at 77). Additionally, upon his apparent review of her personnel file, he inquired whether she was still legally married because she had filed for divorce in 2004 and asked her 'why aren't you divorced yet?' (Exhibit A at 78). Additionally, he inquired whether plaintiff had children and then offered his marital

21

status and ethnic background confirming to plaintiff that he, like plaintiff, was Polish and inquired whether she knew how to cook Polish. (Exhibit A at 78). Additionally, he inquired whether plaintiff, when she became pregnant and had her children encountered a situation where "<u>stretch marks</u>" were on her body to which plaintiff replied, plaintiff indicated in deposition that she was intimidated at that point and plaintiff told him that the question made her very <u>uncomfortable</u>. (Exhibit A at 80). At that time, Mr. Kolorus stated that even if she had stretch marks from giving birth, that he would probably "<u>bet</u>" that she could still wear a two piece bathing suit and then invited her to come to his house to sunbathe and asked plaintiff to permit him to stare at her from a window inside of his house. (Exhibit A at 81). In reply, plaintiff rejected the invitation and expressed that she is in a relationship with the man who she loves very much to which Mr. Kolorus replied, in vulgar sexual suggestion, that plaintiff "<u>ask him if he shares</u>." (Exhibit A at 82). Thereafter, at the same time, Mr. Kolorus then instructed plaintiff to accompany him outside during which he observed that plaintiff looked really good for her age and that [he] would never have guessed that she was as old as she is which plaintiff testified in her deposition was offensive. (Exhibit A at 84). Additionally, during this outside meeting, Chief Dispatcher Leo Vanesky approached Mr. Kolorus and plaintiff, leaned against a pole approximately ten to twelve feet away and during this time Mr. Kolorus briefly re-directed the conversation back to legitimate discussions concerning her operation of the bus and a discussion of a preventable accident which Mr. Kolorus offered the opinion that it "meant nothing", that it was just a warning letter procedure. It was during this time, while Mr. Kolorus was already within close quarters to her, that Mr. Kolorus stepped forward, <u>poked her</u> on her chest several times and, "when he released his hand from the poke is when my biggest insult happened to me. He did not just release his hand and take it back. He took his hands and <u>cupped my breasts</u> and sneered, and it wasn't – it wasn't (indicating) – it wasn't an accident . . . he took his hands. He cupped my breasts. He felt my breasts. He put his hand, and he laughed. Leo Vanesky, at the same time, left because Leo Vanesky saw this happen and when Mr. Vanesky walked by "he looked at me. He laughed and walked into the dispatch office." (Exhibit A at 89-90).

(Doc. No. 58, ¶ 9) (emphasis in original).

Additionally, the plaintiff alleges that, on one occasion, Mr. Koloras approached her and asked her who she knew to get this job as a driver with COLTS and asked her to describe what favors (sexual favors) that she performed to get the job. Mr. Koloras denies ever saying the phrase.

As set forth above, the plaintiff alleges that, on one occasion, Mr. Koloras touched her breasts in the presence of head dispatcher, Leo Vanesky. The plaintiff testified that she did not confront either Mr. Koloras or Mr. Vanesky about this incident. The plaintiff did testify that she reported to the Human Resources Manager, Dorothy Sterling-Hill, the above incidents, as well as that Mr. Koloras had physically touched her, after which she was directed to contact the General Manager, Paul Tolerico. (Doc. No. 50, Ex. A, p. 102). Ms. Sterling-Hill denies being informed of the sex-based incidents.

The plaintiff also testified that she called Mr. Tolerico and indicated, in part, that she had to speak to him ". . . on a more personal matter about personal things that have happened that are totally inappropriate from Tony (Kolorus) towards me . . ." (Doc. No. 50, Ex. A, p. 106).

The plaintiff's employment with COLTS was governed by the Collective Bargaining Agreement dated July 1, 2005, through June 30, 2009, between the County of Lackawanna Transit System Authority and Transit Union

Division No. 168, as well as by the COLTS' Employee's Handbook[17].

The plaintiff was issued the Employee's Handbook which specifically addresses Driver/Operator responsibilities and Rules of Discipline for failure to comply. Likewise, the Collective Bargaining Agreement also addresses Driver/Operator responsibilities. The plaintiff received the Employee Handbook and acknowledged receipt of the handbook on October 27, 2006. The plaintiff was also provided a copy of the Collective Bargaining Agreement.

The Employee's Handbook, Section 18, titled "Accidents: Written Report" provides: "A full and complete written report of every accident occurring on or near the vehicle, no matter how trivial, must be made by the operator . . . Notify the Dispatcher of the accident prior to moving your bus from the scene of the accident." Section 19, titled "Accident Information Reporting to Dispatcher" provides, " . . . Always make a written report of accidents on return to your garage." Additionally, Section 51 of the Employee's Handbook, titled "Careless Operation" provides, "Any Authority employee observed operating an Authority vehicle in a careless manner or

---

[17]Although in response to COLTS' statement of fact the plaintiff denies that her employment was governed by the handbook claiming that it was not provided at the start of her employment and was only provided after her complaints of sexual harassment, the plaintiff has admitted in response to the County's statement of facts that "COLTS's 2006-2007 employee handbook sets forth the standards, policies and procedures which governed Plaintiff's employment at COLTS." (Doc. No. 42, ¶6; Doc. No. 56, ¶6).

intentionally abusing Authority property or equipment is subject to discipline up to and including dismissal."

The Collective Bargaining Agreement, Section 10, titled "Accident Reports" provides "All accidents, however slight, involving or occurring on or near a motor coach . . . all accidents, however slight, connected with the operation of the Maintenance Department of the Company, . . . must be immediately reported to a supervisor. In the case of an operator reporting an accident to a dispatcher, it will be the dispatcher's responsibility to ascertain sufficient facts to determine if the occurrence requires the filing of an accident or incident report. An incident report may be taken over the radio by the dispatcher . . . It will be the operator's responsibility to obtain all pertinent information, such as correct location, names and addresses of witnesses, and all other information that will be useful to the Company . . . It will be the operator's responsibility to check with the Executive Director [General Manager] on the next work day to be sure it was received and give any additional information that may be required.

Additionally, Section 22 of the Employee's Handbook titled, "Report for Duty" provides, "All operators must report for duty at scheduled times. Extra operators must not absent themselves after answering roll call, except with the permission of the Dispatcher."

Section 34 of the Collective Bargaining Agreement titled, "Miss-outs" provides, "Miss-out (failing to report for duty) will be on a one hundred thirty (130) day basis. Each one hundred thirty (130) day period will start from the date of the first or previous miss-out. Penalties for each miss within the one hundred thirty (130) day period will be: Miss Out #1: Warning Letter."

Throughout her employment, the plaintiff was involved in accidents that were classified as preventable after review by the Accident Review Committee. Additionally, the motor coach assigned to her was damaged during her operation for which she failed to report to dispatch or a supervisor as required by the Employee's Handbook and Collective Bargaining Agreement.

On July 7, 2006, the plaintiff was involved in an accident wherein she struck a telephone pole. The accident was reported and found preventable based upon the fact that the plaintiff operated the vehicle too closely to a fixed object. (Doc. No. 50, Ex. F). The plaintiff denies that this was the case indicating that a car was coming directly in her lane toward the bus and "to avoid a head-on collision, I moved my bus to the shoulder of the road, clipping the passenger mirror and knocking the mirror off . . . [e]ven with that, I was, she [the other driver] realized we were going to have a head on collision at this point, swerved, and by the grace of God she missed me . . . [s]he had a

child in the car. It was dark. It was winter." (Doc. No. 50, Ex. A, p. 122). With respect to this incident, the plaintiff testified that Mr. Kolorus informed her "[n]ext time, if you don't want to get charged with anything, (a preventable accident write up) hit the car head on." (Doc. No. 50, Ex. A, p. 123).

On October 19, 2006, a disciplinary hearing was held by COLTS to discuss two separate instances related to the plaintiff's performance during an accident that was determined to be preventable and the plaintiff's failure to perform her responsibilities as an extra operator. As a result, she was suspended for one day.

The Collective Bargaining Agreement, Section 5, titled "Probationary Period" provides "All new full-time employees in any department shall be on probation for a period of ninety (90) working days from the date of employment. By mutual agreement, the probationary period may be extended."

The plaintiff was informed on October 24, 2006, by Mr. Koloras that her probationary period was being extended an additional ninety days. On January 24, 2007, the plaintiff was informed by Mr. Koloras that her probationary period would be extended an additional 180 days, for a total of 360 days. The plaintiff testified that she did not agree with the probation extensions and so informed Mr. Koloras and Mr. Vanesky. (Doc. No. 50, Ex.

27

A, p. 201).

On November 10, 2006, the plaintiff was provided a letter regarding "Accident Review Committee Meeting -- 11/7/06 "Warning Letter #2," as a result of an accident on October 19, 2006, which was found to be preventable as a result of the plaintiff operating a vehicle too closely to a telephone pole.

On December 16, 2006, the plaintiff was provided a letter regarding "Warning Letter – Failure to Notify Dispatcher of Damage" related to a report on December 4, 2006, by the plaintiff of oil leaking from the motor coach. The plaintiff failed to report that the oil was leaking from the motor coach as a result of turning around in a parking lot damaging the oil pan.

Additionally, on December 16, 2006, the plaintiff was provided a letter from Mr. Koloras regarding "Warning Letter Unreported Damage – (Bus #213)" related to damage to the right rear of the bus on December 4, 2006. The letter indicates that the plaintiff either damaged the bus while in operation and failed to report the damage, or failed to detect and report the damage when she accepted the bus at the beginning of her shift.

On January 10, 2007, the plaintiff was provided a letter from Mr. Koloras regarding "Accident Review Committee Meeting – 1/2/07 Warning Letter" related to preventable damage as a result of the accident on December 4, 2006.

28

Although COLTS has provided a Sexual Harassment Policy, which indicates that all complaints of alleged sexual harassment were to be in writing to Mr. Talerico, the policy is unsigned and undated. In addition, Mr. Talerico testified to a lack of any knowledge concerning awareness of signing such a sexual harassment policy. (Doc. No. 50, Ex. B, pp. 20, 30).

At no relevant time did the plaintiff file a written complaint with Mr. Talerico alleging sexual harassment or gender discrimination.

COLTS' statement provides that other employees, including male employees, were provided letters of warning related to preventable accidents, failure to report for duty/miss-outs, and unreported damage[18].

The plaintiff terminated her employment with COLTS on March 2, 2007.

In support of its motion for summary judgment, COLTS first argues that the plaintiff has failed to establish a *prima facie* case of gender discrimination claims under either Title VII or the PHRA. (Doc. No. 49, pp. 6-9). Here, COLTS argues that these claims are considered under the familiar framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which requires first that the plaintiff must make a *prima facie* showing of discrimination by establishing (1) that she is a member of a protected class; (2) she was

___

[18]The court notes that there is no record support cited for this fact; however, the plaintiff admits the fact and, as a result, it is included herein as undisputed.

discharged from a job; (3) she was qualified for the job from which she was terminated; and (4) she was replaced by a person not in the protected class.

COLTS concedes that the plaintiff has satisfied the first, third and forth factors of the *prima facie* case, but argues only that the plaintiff has failed to show that she was discharged from her job. COLTS argues that the facts of this case illustrate that the plaintiff voluntarily terminated her employment and that she has failed to establish that she was constructively discharged.

Title VII allows a plaintiff to raise a claim of constructive discharge. Pennsylvania State Police v. Suders, 542 U.S. 129, 142-43 (2004); Suders v. Easton, 325 F.3d 432, 443-44 (3d Cir. 2003) (judgment vacated and overruled only with respect to the ruling on an employer's recourse to affirmative defenses in a hostile work environment claim predicated on vicarious liability, not with respect to the elaboration of a constructive discharge claim by the Third Circuit). The test is objective in light of the totality of the circumstances. Suders, 542 U.S. at 141; Suders, 325 F.3d at 444-445. An employer is liable for constructive discharge when it knowingly allows the plaintiff to endure such intolerable working conditions that "a reasonable person in the employee's position would have felt compelled to resign." Suders, 542 U.S. at 141, 147; see Suders, 325 F.3d at 443-44 ("[A]cts of discrimination in violation of Title VII can make working conditions so intolerable that a reasonable employee

would be forced to resign.") (quoting <u>Goss v. Exxon Office Sys. Co.</u>, 747 F.2d 885, 887 (3d Cir. 1984)). In order to establish a claim of constructive discharge, the plaintiff must show that "the alleged discrimination surpasses 'a threshold of "intolerable conditions"'" "such that it was foreseeable that a reasonable employee would have felt compelled - that is, "would have had no choice but" - to resign rather than endure them. <u>Suders, 325 F.3d at 444</u> (quoting <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 169 (3d Cir. 2001); <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 976 (3d Cir. 1998) (internal quotation omitted)). The Third Circuit has stated that two elements must converge to establish a constructive discharge: the plaintiff suffered intolerable harassment that would drive a reasonable person to resign; and, the plaintiff's resignation under the circumstances was reasonable. <u>Suders, 325 F.3d at 445</u>.

Here, COLTS argues that despite the plaintiff's "litany of instances" that she feels crossed the threshold of intolerable conditions, she "made no effort to neither file a formal grievance, inform her loved ones of the matter at the time of said matter, nor definitively speak of this incident to anyone in management." In considering COLTS' argument that the plaintiff failed to file a grievance or speak to anyone in management, the record indicates that, although the plaintiff concedes that she did not file a <u>written</u> grievance, there

is a material dispute as to whether managerial officials were on notice of the incidents outlined by the plaintiff such that they had a duty to investigate the plaintiff's claims. Here, the plaintiff testified that she attempted to report these instances to the Human Resource Manager on at least two occasions and to the General Manager on at least one occasion. Moreover, the record indicates that, when directed by the General Manager to work out her own problems, the plaintiff even attempted to resolve the issue with Mr. Koloras and Mr. Vanesky, her supervisors and alleged harassers, but testified on the very next day, she was only subject to more ridicule. Further, despite COLTS' argument that the plaintiff made no attempt to inform her loved ones of what was happening, the record reflects the plaintiff's testimony that she did inform her loved ones of what is described as the most serious of the incidents, in that she testified that she informed her mother about the alleged breast groping incident with Mr. Koloras. (Ex. 50, Ex. A, p. 92).

COLTS also argues, without support, that the plaintiff has failed to establish that she was constructively discharged because she has not presented evidence from any of the other women who worked at COLTS indicating that they were singled out or treated differently. However, the instant action is not about the other women who worked at COLTS, it is about the plaintiff, and the plaintiff has presented sufficient testimony to create a

material issue of fact as to whether she was subjected to such conditions as to render her constructively discharged.

Finally, again with no support, COLTS argues that the fact that the plaintiff obtained employment the week after she left COLTS renders her unable to establish her claim that she was constructively discharged. The court finds the plaintiff's subsequent ability to obtain employment irrelevant to whether the working conditions at COLTS were so intolerable as to constitute a constructive discharge.

In light of all of the above, COLTS' motion for summary judgment will be denied to the extent that it argues that the plaintiff has failed to state a *prima facie* case of gender discrimination pursuant to either Title VII or the PHRA because she has failed raise a sufficient issue of fact as to whether she was constructively discharged.

Next, COLTS argues that the plaintiff cannot establish a *prima facie* case for hostile work environment based on sexual harassment. (Doc. No. 49, pp. 9-11). Here, COLTS argues that the plaintiff must show: (1) she suffered intentional discrimination because of sex; (2) the discrimination was pervasive or severe; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex

in that position; and (5) the existence of respondeat superior liability[19]. Without discussing the specific elements, COLTS argues here again that the fact that the plaintiff has failed to produce any grievances or complaints by the other women who worked with the plaintiff makes it difficult for her to prove that she was discriminated against because of her gender. As indicated above, the instant action is about the plaintiff, not the other women who worked with the plaintiff. Moreover, whether or not it may be difficult for the plaintiff to prevail on her claim due to absence of such corroborative evidence is not the issue; instead, the issue on summary judgment is whether there is a sufficient issue of material fact in order to allow the plaintiff to proceed. COLTS does not address the plaintiff's claim in this respect.

In addition, COLTS again argues that the plaintiff failed to report the alleged incidents to proper authorities. COLTS argues that this, coupled with Ms. Sterling-Hill's testimony denying ever hearing of any sexual harassment claim by the plaintiff, is fatal to the plaintiff's claim. This, however, only creates an issue of fact. The plaintiff has testified that she reported the incidents on several occasions to both Ms. Sterling-Hill and Mr. Tolerico. They deny that

---

[19]See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)); Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), *overruled in part on other grounds by* Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006).

she ever reported such incidents. Whether or not the plaintiff reported such incidents is a matter of credibility and a question of fact.

Considering these are the only arguments raised by COLTS in relation to the plaintiff's hostile work environment claim, COLTS' motion for summary judgment will be denied with respect to this claim.

Finally, COLTS argues that the plaintiff has failed to establish a *prima facie* claim of retaliation under the PHRA. In order to establish such a claim, COLTS argues that the plaintiff must show: (1) she engaged in protected activity; (2) she suffered some adverse employment action; and (3) there was a causal connection between (1) and (2)[20].

Here, COLTS argues that it is "difficult to deduce exactly what protected activity the Plaintiff is claiming she engaged in." However, from a reading of the plaintiff's complaint and filings, it is clear that the plaintiff is claiming that her reporting of sexual harassment and/or discrimination was the protected activity in which she engaged. The court finds that such would satisfy the first element of a retaliation claim.

COLTS also argues that, even assuming that the plaintiff's complaints

---

[20]See Miller v. Aluminum Co. of America, 679 F.Supp. 495, 504 (W.D.Pa.), *aff'd mem.* 856 F.2d 184 (3d Cir. 1988); Robert Wholey Co. v. Pennsylvania Human Relations Comm'n, 606 A.2d 982, 983 (Pa.Cmwlth.), *alloc. denied*, 615 A.2d 1314 (Pa. 1992) (quoting Frederick v. Reed Smith Shaw & McClay, 1994 U.S. Dist. LEXIS 1811 (E.D.Pa. Feb. 18, 1994)).

of sexual harassment constituted the protected activity, the plaintiff has not established that she suffered any subsequent adverse employment action as a result of those reports, nor that there was a causal connection. Here, the court agrees.

Initially, the record indicates that the employee handbook and the collective bargaining agreement outline certain incidents for which disciplinary action will be taken. In each instance where the plaintiff received discipline, the infraction for which she was disciplined was provided for in the employee handbook, the collective bargaining agreement, or both. Further, the plaintiff does not dispute that she was involved the incidents for which she was disciplined, but merely tries to explain why she should have been excepted from disciplinary action.

Moreover, the plaintiff has not shown that the disciplinary actions she received became more severe or frequent after her complaints of harassment. In fact, the plaintiff alleges that she suffered adverse actions, literally, almost from the first day of her employment, even before any complaints of harassment were ever made. Those disciplinary actions appear to be consistent throughout her employment and in direct response to the incidents in which she was involved.

Finally, although the plaintiff indicates that some of the disciplinary write-

36

ups she received were discriminatory because of her complaints of sexual harassment, she also admits that she was not the only driver being reprimanded for work related violations, with those being reprimanded including male drivers.

In light of the above, the court finds that the plaintiff has not sufficiently made out a *prima facie* case of retaliation in that she has not shown that she suffered adverse action as a result of her complaints of harassment and discrimination, nor that there is a causal connection. As such, summary judgment should be granted in favor of COLTS on this claim.

On the basis of the foregoing, **IT IS HEREBY ORDERED THAT:**

(1)  the motion for summary judgment filed on behalf of the County, **(Doc. No. 41)**, be **GRANTED**; and

(2)  the motion for summary judgment filed on behalf of COLTS, **(Doc. No. 48)**, be **DENIED IN PART AND GRANTED IN PART** as set forth above.


*s/ Malachy E. Mannion*
MALACHY E. MANNION
United States Magistrate Judge

Date:  December 15, 2011

O:\shared\MEMORANDA\2008 MEMORANDA\08-2205-01.wpd